## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

HONEYWELL INTERNATIONAL, INC. f/k/a ALLIED CHEMICAL
CORPORATION and as ALLIED SIGNAL, INC., and GEORGIA POWER
COMPANY,

*Defendants-Appellants*,

*v.*

CITY OF BRUNSWICK, by and through its MAYOR AND BOARD OF
COMMISSIONERS,

*Plaintiff-Appellee.*

On Appeal from the United States District Court
for the Southern District of Georgia
No. 2:22-cv-00132

## AMICUS CURIAE BRIEF BY ALTAMAHA RIVERKEEPER, COOSA RIVER BASIN INITIATIVE, GLYNN ENVIRONMENTAL COALITION, ONE HUNDRED MILES, AND SATILLA RIVERKEEPER IN SUPPORT OF PLAINTIFF-APPELLEE

April S. Lipscomb
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050, Atlanta, GA 30309
Tel: (404) 521-9900
Fax: (404) 521-9909

*Counsel for Amici*

*City of Brunswick v. Georgia Power Company*; Appeal No. 23-13200

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, 28-1(b), and 29-2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case and were omitted from the Certificates of Interested Persons in briefs that were previously filed in this appeal.

1. Altamaha Riverkeeper, Amicus Curiae

2. Coosa River Basin Initiative, Amicus Curiae

3. Glynn Environmental Coalition, Amicus Curiae

4. Lipscomb, April S., counsel for Amici Curiae

5. One Hundred Miles, Amicus Curiae

6. Satilla Riverkeeper, Amicus Curiae

7. Southern Environmental Law Center, law firm of counsel for Amici Curiae

Amici and Southern Environmental Law Center are non-profit organizations with no parent corporation and no stock held by any public corporation.

/s/ April S. Lipscomb
April S. Lipscomb
Georgia State Bar No. 881745
*Counsel for Amici*

# TABLE OF CONTENTS

INTEREST OF AMICI ............................................................................ 1

STATEMENT OF THE ISSUES ............................................................ 2

SUMMARY OF THE ARGUMENT ...................................................... 2

ARGUMENT ......................................................................................... 4

   I.   In Georgia, Migrating Pollution Is Classified as a Continuing Nuisance No Matter How Long Ago the Activity That Created the Pollution Ended.... 5

   II.  Georgia Power's Permanent Nuisance Cases, in Which the Property Damage Was Immediately Observable, Are Not Analogous to Environmental Contamination Cases Like This One. .................................... 8

   III.  Georgia Power Is Not Entitled to Special Treatment as a Public Utility, And Its Position on Continuing Nuisances Undermines the Public Interest and Contravenes the Basic Principles of Tort Law. ...................................... 14

CONCLUSION ..................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*City of Brunswick v. Honeywell Int'l, Inc.*,
    No. 2:22-cv-00132-JRH-BWC, 2023 WL 5671290 (S.D. Ga. Sept.
    1, 2023) ................................................................................................10

*Crosson v. Carrollton City School Dist.*,
    478 F. Supp. 3d 1255 (N.D. Ga. 2020) ..................................................9

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49 (1987) ...............................................................................19

*Parris v. 3M Co.*,
    595 F. Supp. 3d 1288 (N.D. Ga. 2022) ...........................................12, 13

*Scarlett & Assocs., Inc. v. Briarcliff Ctr. Partners*,
    No. 1:05-CV-0145-CC, 2009 WL 3151089 (N.D. Ga. Sept. 30,
    2009) ..................................................................................................7, 11

*Stillwell v. Allstate Ins. Co.*,
    663 F.3d 1329 (11th Cir. 2011) ..............................................................3

*Tucker v. S. Wood Piedmont Co.*,
    28 F.3d 1089 (11th Cir. 1994) ...............................................................6

**State Cases**

*Amalgamated Transit Union Local 1324 v. Roberts*,
    434 S.E.2d 450 (Ga. 1993) ...................................................................19

*Capogeannis v. Superior Ct.*,
    12 Cal. App. 4th 668 (Cal. Ct. App. 1993) ..........................................18

*City of Atlanta v. Kleber*,
    677 S.E.2d 134 (Ga. 2009) .....................................................................9

*Columbia Cnty. v. Satcher*,
    369 Ga. App. 608, 612 (2023) .............................................................16

*Cox v. Cambridge Towne Homes, Inc.*,
236 S.E.2d 73 (Ga. 1977) ...............................................................15, 16

*Denver Publ'g Co. v. Bueno*,
54 P.3d 893 (Colo. 2002)...................................................................16

*Hoery v. United States*,
64 P.3d 214 (Colo. 2003)...............................................................17, 18

*Hoffman v. Atlanta Gas Light Co.*,
206 Ga. App. 727 (1992) .....................................5, 6, 7, 8, 10, 11, 20

*McEachern v. Muldovan*,
505 S.E.22d 495, 499 (Ga. Ct. App. 1998)......................................16

*McEachern v. Muldovan*,
523 S.E.2d 566 (Ga. 1999) ...............................................................16

*Mel Foster Co. Props., Inc. v. Am. Oil Co. (Amoco)*,
427 N.W.2d 171 (Iowa 1988) ...........................................................13

*Oglethorpe Power Corp. v. Forrister*,
711 S.E.2d 641 (Ga. 2011) .................................................7, 8, 9, 15

*Smith v. Branch*,
487 S.E.2d 35 (Ga. Ct. App. 1997)....................................................7

*Smits v. Park Nicollet Health Servs.*,
979 N.W.2d 436 (Minn. 2022) .........................................................16

*Tri-Cnty. Inv. Grp., Ltd. v. S. States, Inc.*,
500 S.E.2d 22 (Ga. Ct. App. 1998).............................................7, 11

*Wise Business Forms, Inc. v. Forsyth Cnty.*,
893 S.E.2d 32 (Ga. 2023) ...............................................8, 9, 15, 16

**Federal Statutes**

28 U.S.C. § 1442 ................................................................................2

**State Statutes**

O.C.G.A § 9-3-30................................................................................3, 4

## Rules

Fed. R. App. P. 29(a)(4)(E)......................................................................2

## Other Authorities

Albert C. Lin, *Deciphering the Chemical Soup: Using Public
Nuisance to Compel Chemical Testing*, 85 Notre Dame L. Rev.
955, 957 & n. 2 (2010)......................................................................13

74 Am. Jur. 2d *Torts* § 2 (Oct. 2023 Update) ........................................19

*Arwood v. Ga. Power Co.*,
No. 2023-SU-CV-0029 (Monroe Cnty. Super. Ct. Jan. 19, 2023)....................11

*Bowdoin v. Ga. Power Co.*,
No. 2023-SU-CV-0172 (Monroe Cnty. Super. Ct. May 12, 2023)...................11

*City of Rome v. 3M*,
No. 19-cv-02405-JFL0003 (Floyd Cnty. Super. Ct. Nov. 19, 2019) .................20

Drew Kann & J. Scott Trubey, *Rome will receive $75 million from 3M
to settle PFAS pollution case*, Atlanta J.-Const. (Sept. 29, 2023),
https://www.ajc.com/news/rome-will-receive-75-million-from-3m-
to-settle-pfas-pollution-
case/ADOI4GC2QBHINMUECVSEN7ET64/ ..................................21

Elizabeth Ann Coleman, *In re* Hoery v. United States*: Compensating
Homeowners for Loss of Property Value Due to Toxic Pollution
Under the Continuing Tort Doctrine*, 16 Vill. Env't L. J. 35, 36
(2005) ...............................................................................................19

Jeffrey Kluger, *'Forever Chemical' Lawsuits Could Ultimately Eclipse
the Big Tobacco Settlement*, Time (July 12, 2023),
https://time.com/6292482/legal-liability-pfas-chemicals-lawsuit/.....................14

Meris Lutz & Stephanie Lamm, *Toxic 'forever chemicals' founds in
drinking water across Georgia*, Atlanta J.-Const. (Sept. 15, 2023),
https://www.ajc.com/news/business/toxic-pfas-forever-chemicals-
found-in-drinking-water-across-
georgia/6YT2NLRAQZA5PJW2TMVQLPFVYI/ ...........................................20

Nedra Rhone, *Middle Georgians take legal action against Georgia Power over coal plant*, Atlanta J.-Const. (Aug. 4, 2020), https://www.ajc.com/news/juliette-residents-take-legal-action-against-georgia-power/ZNVIOGAWKFASJIC64ACWTNPLUY/ ...................11

1 *RCRA and Superfund: A Practice Guide* § 5:38 (3d ed. Oct. 2023 Update)...........................................................................................................19

U.S. Environmental Protection Agency, *Our Current Understanding of the Human Health and Environmental Risks of PFAS* (updated June 7, 2023), https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.............................14

U.S. PIRG Education Fund & Environment America Research and Policy Center, *Funding shortfalls hinder 'Superfund' program's ability to clean up toxic sites* (Feb. 10, 2021), https://environmentamerica.org/center/media-center/new-report-toxic-waste-cleanup-efforts-lag-putting-americans-at-risk/ ..............................20

# INTEREST OF AMICI

Proposed Amici are environmental non-profit organizations that work with community members to protect and restore the waters and other natural resources of the State of Georgia. Amici's identities and interest statements are set forth fully in the accompanying motion for leave to file this brief.

Glynn Environmental Coalition and One Hundred Miles are based in Brunswick, Georgia, and work to educate the local community about the dangers of industrial pollution, including the type of legacy contamination at issue in this case—mercury and polychlorinated biphenyls. Glynn Environmental Coalition and One Hundred Miles also organize and engage with the public, government agencies, health organizations, and other entities to advocate for the cleanup of hazardous waste sites in and around Brunswick. Both groups have an interest in seeing polluters held accountable for the longstanding and ongoing damage they have done to Brunswick's citizens and environment.

Altamaha Riverkeeper, Satilla Riverkeeper, and Coosa River Basin Initiative are dedicated to preserving the water quality of the Altamaha watershed, the Satilla River, and the upper Coosa River basin, respectively. To ensure the State's waters can support beneficial uses by humans and wildlife, these three organizations routinely perform water quality testing, monitor industrial facilities, and investigate spills and other pollution events. When necessary, they also file lawsuits against

those responsible for pollution to enforce compliance with state and federal environmental laws. Some of the arguments made in this appeal, if accepted, threaten to undermine state nuisance and trespass laws, which are among the most effective legal tools available to riverkeepers, municipalities, and property owners for abating and compensating for environmental contamination.[1]

## STATEMENT OF THE ISSUES

Was Georgia Power Company fraudulently joined to defeat diversity jurisdiction, where the City of Brunswick alleges Georgia Power caused toxic mercury to migrate onto the City's property within the four-year statute of limitations governing the City's continuing nuisance and trespass claims?[2]

## SUMMARY OF THE ARGUMENT

This Court should reject Georgia Power's argument that the City fraudulently joined Georgia Power for the sole purpose of defeating diversity jurisdiction. To establish fraudulent joinder, Georgia Power must prove by "*clear and convincing evidence*" that there is "*no possibility*" the City can establish a cause of action against

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief or contributed money intended to fund this brief's preparation or submission.

[2] There are two additional issues presented in this appeal: whether the District Court erred in finding (1) the federal officer removal statute, 28 U.S.C. § 1442, does not apply and (2) this case does not involve a claim arising under federal law. Amici agree with the City that the District Court correctly applied the law governing each of those issues to the facts of this case.

it. *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011) (emphasis added) (citation omitted). Georgia Power cannot meet that demanding standard.

Georgia Power principally argues that the City's nuisance and trespass claims are futile because they are barred by the four-year statute of limitations set forth in O.C.G.A § 9-3-30. However, in Georgia, the migration of environmental contamination—which is the sole nuisance alleged in this case—qualifies as a continuing nuisance. That means a new cause of action accrues with each continuance of the nuisance, and the City can recover for any damages it suffered within the four years before filing suit.

Georgia Power asks this Court to depart from that decades-old, well-settled rule and to instead start the clock on the City's claims from the moment when Georgia Power stopped releasing mercury into the atmosphere. But the timing of this case—and of environmental contamination cases, generally—is more nuanced than that. It takes time for chemical substances to migrate from the point of release to other properties; it takes time to discover the presence of chemical substances even once they have reached other properties; and it takes time for scientists to learn that chemicals which are widely dispersed and were once thought to be safe are in fact hazardous. In short, the permanent nuisance cases relied upon by Georgia Power are not at all analogous to migrating contamination.

Finally, Georgia Power requests special treatment in this case based on its status as a public utility. But Georgia law does not distinguish between nuisances created by private parties and nuisances created by public entities for purposes of running the statute of limitations. Moreover, public policy does not support Georgia Power's position. It does not benefit the State or its citizens to allow a public utility to continue polluting broad swaths of land and water with toxic chemicals decades after it stopped providing the related public service (e.g., generating coal-fired electricity). On the other hand, Georgia's continuing nuisance rule—and the "polluter pays" principle it embodies—fairly places the burden on polluting industries to compensate injured parties and to fund remediation of their hazardous waste rather than leaving the bill with private landowners and taxpayers.

## ARGUMENT

In its Remand Order, the District Court correctly held that the four-year statute of limitations set forth in O.C.G.A. § 9-3-30 does not bar the City's continuing nuisance and trespass claims against Georgia Power. Georgia Power urges this Court to reverse that holding based on a deceptive framing of the City's case. Contrary to the plain allegations in the Complaint, Georgia Power argues that the sole nuisance it allegedly created was "the emission of mercury resulting from the burning of coal" at Plant McManus. Appellant Georgia Power's Br. 10, 19. That nuisance, Georgia Power reasons, was permanent and is now time-barred. *Id.* at 19–20. In fact, the City

alleges that it is *the ongoing migration of mercury* onto City-owned marshes and shorelines—not the initial release of mercury—which is causing a nuisance. Compl. ¶¶ 88–89, 110–11, 121–22. Once this misrepresentation in Georgia Power's brief is corrected, it becomes clear that Georgia law treats migrating pollution as a continuing nuisance. To hold otherwise would not only upend Georgia's tort jurisprudence, but it would also undermine one of the most powerful legal tools available to municipalities and property owners to clean up toxic contamination.

## I. In Georgia, Migrating Pollution Is Classified as a Continuing Nuisance No Matter How Long Ago the Activity That Created the Pollution Ended.

The exact question raised by Georgia Power in this appeal has been asked and answered by numerous Georgia courts, beginning with *Hoffman v. Atlanta Gas Light Co.*, 426 S.E.2d 387 (Ga. 1992). The defendants in *Hoffman* were the current and former owners of a pipeline that leaked four times from 1954 to 1956, spilling petroleum products into the soil and groundwater of the plaintiffs' property. *Hoffman*, 426 S.E.2d at 388. The plaintiff property owners informed the defendants of the contamination in 1988 and filed nuisance and trespass claims against them in 1990 after they refused to remove the contamination. *Id.* Echoing Georgia Power's position here, the pipeline owners argued that the statute of limitations governing the plaintiffs' claims expired in 1960—that is, four years after the condition that released the petroleum (i.e., the leaks) ended. *Id.* at 389. According to the pipeline owners, the plaintiffs' nuisance theory confused "past and completed acts" (i.e., the

5

leaks) with the results of those acts (i.e., the contamination). *Id.*

The Georgia Court of Appeals soundly rejected that narrow conception of a continuing nuisance. The nuisance in *Hoffman*, the court held, was not the old holes in the pipeline; "the nuisance [wa]s the continuing exudation and leaching of chemicals into the ground from the contaminants deposited long ago through the leaks." *Id.* at 390. Because the plaintiffs alleged that the contamination was still spreading, it was not a "completed act," and accordingly, the nuisance was continuing, not permanent. *Id.*

> [E]very continuance of a nuisance which is not permanent, *and which could and should be abated*, is a fresh nuisance for which a new action will lie. Consequently . . . suit may be maintained for damages growing out of a nuisance of the character indicated, where the damages . . . were inflicted within four years before the time of filing suit, though the act which originally caused the nuisance was not done within the period of limitation of the action.

*Id.* (citations omitted). In other words, since "[t]he damage was not complete upon the completion of the creation of the leaks," the property owners were "not limited to a cause of action filed within the period of limitations following creation of the leaks or the repairing of the leaks." *Id.*

This application of the continuing nuisance doctrine to environmental contamination has been consistently upheld by state and federal courts, *including this Court*. *See Tucker v. S. Wood Piedmont Co.*, 28 F.3d 1089, 1091 (11th Cir. 1994) ("Under Georgia law, a cause of action for a tort that is continuing in nature—for

example . . . *the underground leakage of hazardous waste onto adjoining property*—accrues at the time of continuance." (emphasis added)); *Scarlett & Assocs., Inc. v. Briarcliff Ctr. Partners*, No. 1:05-CV-0145-CC, 2009 WL 3151089, at *15 (N.D. Ga. Sept. 30, 2009) ("Under the continuing tort doctrine in Georgia, [the plaintiff's] claims accrue with *each new instance of the migration of the contamination*." (emphasis added)); *Tri-Cnty. Inv. Grp., Ltd. v. S. States, Inc.*, 500 S.E.2d 22, 26 (Ga. Ct. App. 1998) (holding the plaintiff presented some evidence of a continuing tort where the defendant's own consultants admitted the contamination could be migrating in the groundwater); *Smith v. Branch*, 487 S.E.2d 35, 37–38 (Ga. Ct. App. 1997) (clarifying that a continuing nuisance applies to situations where contamination continues to spread but not to situations where contamination merely continues to exist).

Georgia Power makes no attempt to reconcile its position with this long line of adverse decisions.[3] Instead, it hopelessly parrots many of the same unsuccessful arguments made by the pipeline owners in *Hoffman*. As this Court considers how to

---

[3] Before the District Court, Georgia Power argued that *Hoffman* is factually distinguishable because the pipeline leaks there resulted from improper maintenance and could be averted at slight expense. That rationale appears nowhere in *Hoffman* but was cherry-picked from a separate case, *Oglethorpe Power Corp. v. Forrister*, 711 S.E.2d 641 (Ga. 2011). To the contrary, *Hoffman* expressly rejected the notion that the creation or repair of the leaks was relevant for defining either the nuisance itself or the start of the limitations period. *See Hoffman*, 426 S.E.2d at 390 ("The question in this case does not revolve around what day the holes appeared in the pipe or what day they were fixed.").

apply the statute of limitations to the City's claims, its analysis should begin and end with *Hoffman* and its progeny. The City has alleged a continuing nuisance in the form of mercury contamination, traceable to Georgia Power, that is actively migrating onto the City's property; therefore, the City may maintain continuing nuisance and trespass claims for the damages it suffered in the four years before initiating this suit.

## II. Georgia Power's Permanent Nuisance Cases, in Which the Property Damage Was Immediately Observable, Are Not Analogous to Environmental Contamination Cases Like This One.

Ignoring *Hoffman*, Georgia Power asks this Court to find a permanent nuisance based on *Forrister*, which the Georgia Supreme Court has since acknowledged is an "imprecise" statement of the permanent nuisance standard. *Wise Business Forms, Inc. v. Forsyth Cnty.*, 893 S.E.2d 32, 37 (Ga. 2023). The trouble for Georgia Power is that *Forrister*, by its facts and its reasoning, is readily distinguishable from the City's allegations and from other cases involving environmental contamination.

The plaintiffs in *Forrister* filed suit in 2007 complaining of noise and vibrations from a power plant that had been operating near them since 2000. *Forrister*, 711 S.E.2d at 642. The *Forrister* court held that these harms constituted a permanent nuisance and that the plaintiffs were limited to filing one cause of action to recover all past and future damages. *Id.* at 644–45. As the Georgia Supreme Court

recently clarified in *Wise Business Forms*, the nuisance alleged in *Forrister* falls into one category of permanent nuisances in which "the harm to the plaintiff's property is *immediately observable* 'upon the creation of the nuisance.'" *Wise Business Forms*, 893 S.E.2d at 37 (emphasis added) (quoting *Forrister*, 711 S.E.2d at 643). For that category of nuisances—when a structure is built or an activity is begun that is "necessarily an injury"—the limitations period is triggered upon the construction of the nuisance. *Id.* (citation omitted); *see also City of Atlanta v. Kleber*, 677 S.E.2d 134, 137 (Ga. 2009) (referring to a situation where "the destruction or damage [is] *at once complete upon the completion of the fact by which the nuisance is created*" (emphasis added) (citation omitted)).

Importantly, the City's case is not one in which the harm to its property was *immediately observable* upon the completion of Plant McManus's coal-generating units or even when Plant McManus stopped burning coal. The City does not allege that the mercury emissions from Plant McManus were "injurious in and of [themselves]," *Wise Business Forms*, 893 S.E.2d at 37, because they produced disruptive noise, light pollution and visual blight, or merely existed. *See, e.g.*, *Crosson v. Carrollton City School Dist.*, 478 F. Supp. 3d 1255, 1260 (N.D. Ga. 2020); *Forrister*, 711 S.E.2d at 644–45; *Kleber*, 677 S.E.2d at 137. Rather, the City complains that the mercury particles, once deposited on land or in water, migrated over time onto the City's property. Therefore, the statute of limitations on the City's

claims did not run from the date Plant McManus was built or from 1972, when Georgia Power transitioned Plant McManus away from coal.

In fact, Georgia Power cannot say at this preliminary stage, without the benefit of discovery and expert testimony, whether the City's claims had even *accrued* by 1972, depending on how long it took for the mercury to reach the City's property. *See City of Brunswick v. Honeywell Int'l, Inc.*, No. 2:22-cv-00132-JRH-BWC, 2023 WL 5671290, at *6 (S.D. Ga. Sept. 1, 2023) (stating the court must evaluate the factual allegations in the light most favorable to the plaintiff on a motion to remand); *see also Hoffman*, 426 S.E.2d at 390 ("The damage was not complete upon the completion of the creation of the leaks, so appellants are not limited to a cause of action filed within the period of limitations following creation of the leaks or the repairing of the leaks.")

This discussion highlights one of the broader implications of Georgia Power's argument. In many, if not most, pollution cases, the harm will not be observable from the moment a chemical is released into the environment or from the moment the release of that chemical is terminated. Timing in these cases turns on several complex factors that are not susceptible to the kind of rigid statute of limitations advocated by Georgia Power.

*First*, unlike blaring noise or pungent odors, environmental contamination is often hidden in soil or groundwater or otherwise moves undetected by the senses.

As a practical matter, property owners do not routinely test their soil or water for hazardous chemicals absent specific notice or some other triggering event. For example, the plaintiffs in *Hoffman* only learned about the petroleum migrating onto their property after prospective buyers conducted environmental testing. *Hoffman*, 426 S.E.2d at 388; *see also, e.g.*, *Scarlett & Assocs.*, 2009 WL 3151089, at *2 (noting environmental investigations were performed as part of the administration of a person's estate); *Tri-Cnty. Inv. Grp.*, 500 S.E.2d at 24 (noting the property owner received notice from the Georgia Environmental Protection Division that its property may be contaminated). Consider also the case of groundwater contamination in Juliette, Georgia. There, residents are suing Georgia Power in tort because arsenic, chromium, lead, and other chemicals have leeched from Plant Scherer's coal ash pond into residential water wells.[4] Although Plant Scherer has been operating since 1982, nearby residents only recently began testing their groundwater in part because of the high rates of cancer and other illnesses within the community.[5] Georgia's continuing nuisance rule is designed to accommodate cases like that.

 *Second*, it naturally takes time for chemical substances to migrate from the

---

[4] *See, e.g.*, *Arwood v. Ga. Power Co.*, No. 2023-SU-CV-0029 (Monroe Cnty. Super. Ct. Jan. 19, 2023); *Bowdoin v. Ga. Power Co.*, No. 2023-SU-CV-0172 (Monroe Cnty. Super. Ct. May 12, 2023).

[5] Nedra Rhone, *Middle Georgians take legal action against Georgia Power over coal plant*, Atlanta J.-Const. (Aug. 4, 2020), https://www.ajc.com/news/juliette-residents-take-legal-action-against-georgia-power/ZNVIOGAWKFASJIC64ACWTNPLUY/.

point of release to other properties. How much time—and how far they travel—depends on many chemical- and site-specific factors such as the transport mechanism in the environment (e.g., groundwater, surface water, or wind); particle size, density, and water solubility; depth to the water table; precipitation; topography, vegetative cover, and land use; and soil type and chemistry. Given the complexities involved in chemical fate and transport, a claim for continuing nuisance or trespass may not accrue until days, weeks, or years after the chemicals are initially introduced into the environment.

This complex process is reflected in a class action tort suit that was filed in 2021 by a resident of Summerville, Georgia, and joined by the City of Summerville. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288 (N.D. Ga. 2022).[6] That case involves a class of synthetic chemicals called per- and polyfluoroalkyl substances, or PFAS. *Id.* at 1306. The chemical properties of PFAS make them highly mobile and water soluble, and they do not naturally break down upon entering the environment or human bodies. *Id.* According to the *Parris* plaintiff, his drinking water became contaminated with PFAS through a chain of events spanning many miles and decades. Specifically, starting in 1992, a textile mill in Trion, Georgia, used and discharged PFAS via its wastewater into Trion's wastewater treatment plant; Trion

---

[6] In addition to his state tort claims, the plaintiff in *Parris* asserted federal causes of action and filed in federal court of his own accord.

then applied wastewater sludge that was contaminated with PFAS onto farm properties in the Raccoon creek watershed; the PFAS leeched out of the sludge and into groundwater that flowed into Raccoon Creek; and finally, Raccoon Creek transported the PFAS downstream to the water intake for Summerville's municipal water supply. *Id.* at 1306–07, 1320. On these allegations, the court declined to dismiss the plaintiff's public nuisance claim. *Id.* at 1339–43.

*Third,* experience teaches us that we often discover the hazardous nature of a chemical substance belatedly—years or even decades after the substance was first introduced into commerce and the environment. *See Mel Foster Co. Props., Inc. v. Am. Oil Co. (Amoco)*, 427 N.W.2d 171, 175 (Iowa 1988) ("An attempt to classify chemical pollution as a permanent or temporary nuisance is further complicated by the presence of rapidly changing scientific technology. Scientific knowledge . . . reveals hidden dangers in chemicals once thought to be safe." (citation omitted)). That was the story, for example, of asbestos, benzene, and (relevant to this case) polychlorinated biphenyls in the 20th century.[7] Today, that is the story of PFAS. Although PFAS have been used since the 1940s in thousands of household products—ranging from food packaging to clothing to cookware—only in recent

---

[7] *See* Albert C. Lin, *Deciphering the Chemical Soup: Using Public Nuisance to Compel Chemical Testing*, 85 Notre Dame L. Rev. 955, 957 & n.2 (2010).

years was the toxicity of PFAS publicly established.[8] Scientific research continues

to reveal the numerous health disorders linked to PFAS exposure, including

increased risk of some cancers, decreased fertility, and developmental delays.[9] As

hundreds of new chemicals enter the flow of commerce each year, this Court should

decline to erect a statute of limitations barrier to migrating contamination suits.[10] In

other words, science must be given time to catch up to the harm.

## III. Georgia Power Is Not Entitled to Special Treatment as a Public Utility, And Its Position on Continuing Nuisances Undermines the Public Interest and Contravenes the Basic Principles of Tort Law.

Georgia Power claims that a public utility should benefit from a "special

framework" when calculating the limitations period on a nuisance it created.

Appellant Georgia Power's Br. 17. As a threshold matter, this argument is irrelevant:

by Georgia Power's own admission, any special framework applies only in

*permanent nuisance* cases, not to continuing nuisances like the migrating

contamination here. *Id.* at 15. Georgia Power is also wrong on the law. According to

Georgia Power, when a public utility creates a permanent nuisance, the statute of

---

[8] *See* Jeffrey Kluger, *'Forever Chemical' Lawsuits Could Ultimately Eclipse the Big Tobacco Settlement*, Time (July 12, 2023), https://time.com/6292482/legal-liability-pfas-chemicals-lawsuit/.

[9] U.S. Environmental Protection Agency, *Our Current Understanding of the Human Health and Environmental Risks of PFAS* (updated June 7, 2023), https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

[10] *See* Lin, *supra* note 6, at 959–60.

limitations begins to run when the harm is observable, and the plaintiff may not file a claim after the limitations period has elapsed. *Id.* By contrast, when a private party creates a permanent nuisance, Georgia Power contends that the plaintiff may file a claim more than four years after the harm was first observable. To support this conclusion, Georgia Power contrasts the outcomes in *Forrister*, which involved a power plant operated by a public utility, and *Cox v. Cambridge Towne Homes, Inc.*, 236 S.E.2d 73 (Ga. 1977), which involved a storm sewer installed by a private landowner.

In reality, the timing of the statute of limitations does not vary for public versus private entities. *Wise Business Forms* makes this point clear. There, the Georgia Supreme Court described in detail how the limitations period operates for three categories of permanent nuisances. *See Wise Business Forms*, 893 S.E.2d at 37. The differentiating factor among those categories was not *who* caused the harm, but *when* the harm became observable to the plaintiff. *See id.* (applying the same standard to injurious activities by "a landowner or government agency"). Indeed, the defendant in *Wise Business Forms* was a *county* whose roadway drainage system was dumping stormwater runoff onto the plaintiff's property, causing it to erode. *Id.* at 38. The court held that the plaintiff could maintain his claim for inverse condemnation by permanent nuisance—20 years after the roadway was completed—

because he had alleged harms occurring within the four years before he filed suit.[11] *Id.* at 39. In sum, Georgia Power gets no reprieve merely because it is a public utility.

Taking a step back, it is important to recognize that granting Georgia Power special treatment here also would not serve the overarching goals of tort law or the public interest. As a general principle, torts are designed to "encourage socially beneficial behavior and deter wrongful conduct." *Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 897–98 (Colo. 2002); *see also Smits v. Park Nicollet Health Servs.*, 979 N.W.2d 436, 455 (Minn. 2022) ("Among the central purposes of tort law is providing an incentive for prosocial behavior."). "Accordingly, courts should make a conscious effort to direct the law along lines which will achieve a desirable social result, both for the present and for the future." *McEachern v. Muldovan*, 505 S.E.22d 495, 499 (Ga. Ct. App. 1998), *rev'd on other grounds*, 523 S.E.2d 566 (Ga. 1999). While it is true that projects like power plants, roadways, and public schools are infused with a public purpose, that does not mean the law treats all harms arising out of those projects as permanent. *See, e.g.*, *Columbia Cnty. v. Satcher*, 893 S.E.2d 181, 186 (Ga. App. Ct. 2023) (finding stormwater runoff from the county's street and stormwater system, although observable since 1996, was "by its nature continuing"; the plaintiff could therefore maintain a nuisance claim for harms that occurred within

---

[11] That was also the basis of the *Cox* decision which Georgia Power incorrectly claims created a separate rule for private party nuisances. *See Wise Business Forms*, 893 S.E.2d at 37–38.

four years of filing suit).

The same applies to Georgia Power's conduct here. Whatever public benefit Plant McManus provided while it was operating as a coal-fired power plant, no defensible policy rationale exists for allowing Georgia Power—*which ended those operations more than 50 years ago*—to continue depositing hazardous materials onto the City's property. There is also no countervailing concern that the City's claims could halt electricity production or require long, expensive upgrades at Plant McManus. *Contra* Georgia Power's Appellate Br. 19. That fact sets this case apart from the public utility decisions cited in Georgia Power's brief. *See id.* at 20–21 (collecting cases in which the public utility being sued was still in service). Put simply, there is no longer any public good to be had from coal-fired electricity generation at Plant McManus; all that remains is the public ill caused by Georgia Power's legacy of unabated mercury contamination. Therefore, Georgia Power should not benefit from any special protection in this case.

The Colorado Supreme Court made a similar policy judgment in a case involving migration of toxic pollution in groundwater and soil. *See Hoery v. United States*, 64 P.3d 214 (Colo. 2003). As Georgia courts have done repeatedly, the Colorado Supreme Court held that contamination is a continuing property invasion as long as it is migrating onto the plaintiff's property. *See id.* at 222. In so holding, the court distinguished environmental contamination from the effects of irrigation

ditches and railroad lines, which are treated as permanent torts for statute of limitations purposes under Colorado law. *See id.* at 222–23.

> We also note that the continued contamination does not benefit the development of our state. In contrast to our policy supporting our holding that the seepage from irrigation ditches constituted a permanent property invasion, there exists no sound public policy supporting the classification of contamination from the release of toxic chemicals as a permanent property invasion. One basis for classifying a property invasion as permanent is whether public policy favors the continuation of the invasion. Irrigation ditches or railway lines are permanent improvements that help develop the state and should be encouraged. This rational comports with the underlying principles of tort law.

*Id.* at 223 (citation omitted); *see also Capogeannis v. Superior Ct.*, 12 Cal. App. 4th 668, 682 (Cal. Ct. App. 1993) (recognizing there is "no legitimate interest" in allowing migrating contamination to persist and, consequently, applying "the courts' general preference for a finding of continuing nuisance").

In arguing that the statute of limitations is controlled by when a pollutant is released, Georgia Power seeks to limit its and other polluters' potential tort liability for unabated contamination. Of course, in many of these cases, the contamination cannot simply be left in place—free to poison drinking water wells, shut down once productive fisheries, and otherwise deter beneficial development in our State. If polluters are not made to pay to remediate their own messes, that financial burden will fall on private landowners, who will mostly lack the resources to fund multi-million-dollar cleanups, and then taxpaying citizens, when the government is forced to coordinate the cleanup response. Shifting the financial burden in this way—from

responsible to innocent parties—cuts against an essential function of tort law. *See* 74 Am. Jur. 2d *Torts* § 2 (Oct. 2023 Update); *Amalgamated Transit Union Local 1324 v. Roberts*, 434 S.E.2d 450, 451 (Ga. 1993) (noting courts are concerned with both compensation of the victim and with admonition of the wrongdoer).

There are also no adequate alternatives to tort laws in the environmental sphere. Although many federal environmental statutes allow for private enforcement, the remedies available under those statutes are generally limited to injunctive relief and civil penalties. Private plaintiffs may not recover for their monetary damages, including the costs of past remedial actions.[12] Without monetary recourse for their injuries, many affected property owners will be left waiting for government intervention, which is beset by its own resource constraints and lengthy delays. The federal Superfund program, which is responsible for cleaning up some of the nation's most contaminated sites, saw its congressional appropriations decline

---

[12] *See, e.g.*, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987) (noting a private citizen suing under the Clean Water Act can obtain an injunction but not monetary damages for himself); 1 *RCRA and Superfund: A Practice Guide* § 5:38 (3d ed. Oct. 2023 Update) ("A successful outcome in a citizen suit [under RCRA] can result in a court order for equitable relief and perhaps a civil penalty. RCRA does not authorize money damages for private plaintiffs."); Elizabeth Ann Coleman, *In re* Hoery v. United States*: Compensating Homeowners for Loss of Property Value Due to Toxic Pollution Under the Continuing Tort Doctrine*, 16 Vill. Env't L. J. 35, 36 (2005) (noting CERCLA does not permit private plaintiffs to recover loss in property value).

for decades until 2020.[13] That year, the Environmental Protection Agency completed cleanups at just 10 *of more than 1,300 sites*.[14] Maintaining the possibility of private abatement actions is clearly preferable for both property owners and the public.

Fortunately, Georgia's continuing nuisance rule, as embodied in *Hoffman*, is already functioning as it should. One final example is warranted. In 2019, the City of Rome sued dozens of chemical companies and manufacturers in nuisance and trespass for contaminating the city's water supply with PFAS.[15] Again, PFAS have been used and discharged into the environment for decades. As a result, municipal water supplies in Georgia and across the country now contain dangerous levels of PFAS, and the cost of upgrading water systems to remove PFAS can cost tens or hundreds of millions of dollars.[16] Through its continuing nuisance suit, Rome recovered at least $233 million, which will cover the cost of a new $100 million

---

[13] U.S. PIRG Education Fund & Environment America Research and Policy Center, *Funding shortfalls hinder 'Superfund' program's ability to clean up toxic sites* (Feb. 10, 2021), https://environmentamerica.org/center/media-center/new-report-toxic-waste-cleanup-efforts-lag-putting-americans-at-risk/.

[14] *Id.*

[15] Compl., *City of Rome v. 3M*, No. 19-cv-02405-JFL0003 (Floyd Cnty. Super. Ct. Nov. 19, 2019).

[16] Meris Lutz & Stephanie Lamm, *Toxic 'forever chemicals' founds in drinking water across Georgia*, Atlanta J.-Const. (Sept. 15, 2023), https://www.ajc.com/news/business/toxic-pfas-forever-chemicals-found-in-drinking-water-across-georgia/6YT2NLRAQZA5PJW2TMVQLPFVYI/.

water treatment plant for the city.[17] Originally, Rome had planned to pay for the new plant by raising (blameless) residents' water rates; those water rate hikes have now been rolled back thanks to the suit.[18] Georgia Power's effort to stamp out success stories like this one should be emphatically rejected.

## CONCLUSION

For the reasons set forth above, Georgia Power has not and cannot prove by clear and convincing evidence that there is no possibility the City can proceed with its continuing nuisance and trespass claims against it. This Court should affirm the decision of the District Court that Georgia Power was not fraudulently joined in an effort to defeat diversity jurisdiction.

---

[17] Drew Kann & J. Scott Trubey, *Rome will receive $75 million from 3M to settle PFAS pollution case*, Atlanta J.-Const. (Sept. 29, 2023), https://www.ajc.com/news/rome-will-receive-75-million-from-3m-to-settle-pfas-pollution-case/ADOI4GC2QBHINMUECVSEN7ET64/.

[18] *Id.*

Respectfully submitted, this the 29th day of January, 2024.

/s/ April S. Lipscomb
April S. Lipscomb
Georgia State Bar No. 881745
SOUTHERN ENVIRONMENTAL LAW
CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel: (404) 521-9900
Fax: (404) 521-9909
alipscomb@selcga.org

*Counsel for Amici*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b)(1) because it contains 5,255 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ April S. Lipscomb
April S. Lipscomb
Georgia State Bar No. 881745
alipscomb@selcga.org

*Counsel for Amici*

**CERTIFICATE OF SERVICE**

I certify that on January 29, 2024, an electronic copy of the foregoing AMICUS CURIAE BRIEF BY ALTAMAHA RIVERKEEPER, COOSA RIVER BASIN INITIATIVE, GLYNN ENVIRONMENTAL COALITION, ONE HUNDRED MILES, AND SATILLA RIVERKEEPER IN SUPPORT OF PLAINTIFF-APPELLEE was filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system, which will automatically send notification of such filing to all counsel of record.

This the 29th day of January, 2024.

/s/ April S. Lipscomb
April S. Lipscomb
Georgia State Bar No. 881745
alipscomb@selcga.org

*Counsel for Amici*
