**FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-13200

————————————————

CITY OF BRUNSWICK,
  by and through its Mayor and
  Board of Commissioners,

*Plaintiff-Appellee,*

*versus*

HONEYWELL INTERNATIONAL, INC.
  f.k.a. Allied Chemical Corporation,
  f.k.a. Allied Signal, Inc.,
THE GEORGIA POWER COMPANY,

*Defendants-Appellants.*

————————————————

Appeals from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:22-cv-00132-JRH-BWC

————————————————

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

BRANCH, Circuit Judge:

Congress has charged the Environmental Protection Agency ("EPA") with identifying sites affected by pollution and undertaking necessary remediation efforts or delegating those efforts to third parties.  One such site surrounds the City of Brunswick, Georgia.  The City sued Honeywell International, Inc., and the Georgia Power Company in Georgia state court asserting that both defendants were liable under state tort law for pollution emanating from that site.  The defendants removed the case to federal court, arguing, among various grounds for removal, that federal officer jurisdiction under 28 U.S.C. § 1442(a)(1)[1] applied, because all the remediation efforts the defendants had undertaken at the site were controlled and delegated by EPA, a federal agency.

---

[1] The federal officer removal statute provides as follows:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

The district court rejected this argument and remanded the case to state court.

While this appeal of the remand order was pending, the Supreme Court further delineated the contours of the federal officer removal test. *See Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. ----, 146 S. Ct. 1052 (2026). With the benefit of oral argument and supplemental briefing, we hold that federal officer removal was proper in this case because the defendants' alleged liability arises out of their obligations under an EPA-mandated consent decree to remediate the plant site, an action that EPA would otherwise have to perform itself.[2]

But first, we consider our jurisdiction to hear the appeal. We conclude that we have jurisdiction to review the district court's remand order, notwithstanding the parties' subsequent litigation activities in state court, because the remand order was automatically stayed upon the defendants' notice of appeal. Accordingly, we reverse the district court's remand order.

## I.    Background

### A.    *Factual Background*

Georgia Power, an electric utility incorporated in Georgia, purchased plots of land ("the Plant Site") in the Brunswick area in 1937 and the following years. Georgia Power used the Plant Site to generate electric power and store petroleum products. As a

---

[2] Because we decide the removal issue on the federal officer removal ground, we do not reach the defendants' other grounds for removal.

result of these operations, hazardous substances, including poly-chlorinated byphenals (PCBs), were released on the Plant Site and into the environment.

In the mid-1950s, a corporation that later became Honeywell acquired the Plant Site and additional land in the area from Georgia Power. Honeywell built and operated a chlor-alkali facility at the Plant Site to produce chlorine gas, hydrogen gas, and caustic solution. These operations led to further disposal of hazardous substances, including mercury and PCBs, within the Plant Site. Honeywell operated the Plant Site until 1979, when Honeywell sold it to another corporation, although Honeywell remained involved in the plant's operations until the plant ceased activity in 1994. Honeywell later reacquired the Plant Site.

In 1995, the defendants entered into an Administrative Order on Consent with EPA, agreeing to undertake a remedial investigation and feasibility study at the Plant Site under EPA's oversight and subject to EPA's approval. EPA subsequently added the Plant Site to the National Priorities List, a "prioritized list of contaminated sites for cleanup, commonly known as Superfund sites" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *See Atl. Richfield Co. v. Christian*, 590 U.S. 1, 6 (2020) (citing 42 U.S.C. § 9605).[3] A few years later, EPA began to mandate remediation actions, such as

---

[3] Once a contaminated site is designated a Superfund site, "EPA may clean [the site] itself or compel responsible parties to perform the cleanup." *Atl. Richfield*, 590 U.S. at 6 (citing 42 U.S.C. §§ 9604, 9606, 9615).

ordering "Honeywell to remove one foot of soil from thirteen acres of the marsh and sediment in creeks in front of the old Honeywell trash dump."

Following extensive investigation activities and additional remedial work on the Plant Site, in 2015 EPA issued a Record of Decision (EPA's official cleanup plan pursuant to CERCLA) selecting remedial actions to be implemented at the Plant Site. The defendants then entered into a consent decree with EPA, incorporating that Record of Decision, to implement the EPA-selected remedial actions subject to EPA's oversight and control.

B.    *Procedural Background*

The City initially filed suit in the Superior Court of Glynn County, Georgia, on October 20, 2022. The suit alleged continuing nuisance and continuing trespass under Georgia law for the defendants' failure to adequately remediate the pollutants emanating from the defendants' land and affecting the City's property. The City alleged that "Honeywell's activities at the Plant Site caused and continue to cause toxic mercury and PCBs to be spilled, discharged and deposited into the Turtle River, its tributaries, surrounding marshlands and onto property of the City of Brunswick." These pollutants, it alleged, entered the City's property "in amounts, concentrations and combinations that are harmful to health, safety and welfare of the citizens of the City of Brunswick, and to animals, birds and aquatic life." According to the City, "[d]efendants' continuing failure and refusal to permanently remove their pollution from property of the City of

Brunswick[] unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property" and with "the City's use and enjoyment of its property." The City therefore alleged that the defendants were "liable for all . . . remediation costs and damages" related to the hazardous waste on City property.

The defendants timely removed the case to the United States District Court for the Southern District of Georgia based on three distinct grounds for subject-matter jurisdiction: (1) federal officer removal under 28 U.S.C. § 1442; (2) federal question jurisdiction under 28 U.S.C. § 1331; and (3) diversity jurisdiction under 28 U.S.C. § 1332(a), asserting that Georgia Power had been fraudulently joined to defeat diversity. The City subsequently moved to remand the case back to state court.

The district court granted the City's motion for remand, rejecting each of the defendants' asserted grounds for removal. As relevant to this appeal, the court concluded that the defendants were not "acting under" a federal officer when they allegedly released pollutants into the waters and marshlands around the City's property, and that EPA's supervision of the defendants' remediation efforts was not enough to show otherwise, thus federal officer removal was not warranted.[4] The district court instructed the Clerk to "REMAND this case to the Superior Court of Glynn County, Georgia" and to "CLOSE this case" on

---

[4] The district court also rejected the defendants' reliance on federal question and diversity jurisdiction.

September 1, 2023, and the district court's remand order was docketed in state court on September 6, 2023. The defendants timely appealed the district court's order on September 25 and 26, 2023.

After the district court issued its remand order and we docketed the defendants' appeal, the parties continued litigating this case in state court. Glynn County Superior Court received a certified copy of the order remanding the case on September 6, 2023, and reasserted jurisdiction over the matter. The superior court initially stayed the proceedings pending appeal, but later granted the City's motion to withdraw the stay in April 2024. Both Honeywell and Georgia Power filed answers and motions to dismiss the City's complaint in the state court proceedings. As litigation continued, the City amended its complaint twice.

Meanwhile, the City filed a motion to dismiss this appeal, arguing that the defendants had waived their right to appeal the remand order by substantially litigating the case in state court.[5] Upon being notified of the City's amended complaints in state court, we ordered supplemental briefing on the question of whether the City's amended complaints had any effect on our jurisdiction over the appeal.

After that supplemental briefing, and after oral argument was held, we requested further briefing on whether we should stay the appeal pending the Supreme Court's decision in *Plaquemines*

---

[5] We carried this motion with the case.

*Parish*, 146 S. Ct. 1052, which considered the proper test for federal officer removal. Additionally, we requested briefing on whether *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), required an automatic stay of district court proceedings once the defendants had filed notices of appeal, such that the district court's remand order was without effect. The parties briefed the *Coinbase* issue as it relates to federal officer removal and agreed that we should stay the appeal pending *Plaquemines Parish*, which we did. After the Supreme Court issued its opinion in *Plaquemines Parish*, we lifted the stay and requested and received supplemental briefs from the parties addressing the effect of that opinion on this appeal. We now consider this appeal in the light of all the parties' briefing on the relevant issues.

## II.    Standard of Review

We review questions of subject matter jurisdiction *de novo*. *Wilson v. Hearos, LLC*, 128 F.4th 1254, 1259 (11th Cir. 2025). We also review a district court's remand order *de novo*. *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1161 (11th Cir. 2006).

## III.    Discussion

This appeal requires us to address two distinct questions: (1) whether we have jurisdiction to review the defendants' appeal and (2) whether the defendants properly removed this case to federal court. We answer both questions in the affirmative.

23-13200                 Opinion of the Court                 9

A.     *We have jurisdiction to review this appeal*

Because the parties litigated this case in state court after the district court's remand, the City disputes our jurisdiction over this appeal.  First, the City argues that we should dismiss the appeal because the defendants sought "resolution in their favor" in state court upon remand and thus "waived their right to proceed in federal district court" (elsewhere, "waived removal jurisdiction").  Second, the City contends that its decision to amend the underlying complaint in state court moots this appeal because the initial complaint—the subject of this appeal—no longer governs the case following the City's amended complaints in state court.  The defendants respond that they did not waive their right to appeal by litigating in state court because they had no other option once the state court lifted its stay pending appeal.  They further argue that the City's amended complaints did not divest us of jurisdiction because, among other things, 28 U.S.C. § 1447 provides for appeal as of right following remand orders in cases involving federal officer removal.  We agree with the defendants that we have subject matter jurisdiction to review the remand order, holding that the defendants' timely appeal triggered an automatic stay, such that the state court proceedings are rendered void for our purposes.[6]

---

[6] Because we hold that the notice of appeal automatically stayed the remand order, the amended complaints filed in the post-remand state court proceedings have no legal effect in this Court.  We therefore reject

The federal officer removal statute allows for the removal from state court to federal court of any "civil action or criminal prosecution" against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."   28 U.S.C. § 1442(a)(1).[7]   If a district court determines that removal was improper, it may order the case remanded to state court.  *See id.* § 1447(c).  Generally, we lack jurisdiction to review remand orders. *See id.* § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . .").  But § 1447(d) specially allows appeals in cases involving federal officer removal under § 1442, providing that remand orders "*shall* be reviewable by appeal or otherwise."  *Id.* (emphasis added); *see Thomas v. Phoebe Putney Health Sys.*, 972 F.3d 1195, 1200–01 & n.4 (11th Cir. 2020).

Additionally, every appeal implicates the "*Griggs* principle": "An appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal.'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).  In *Coinbase*, the Supreme Court applied this "longstanding tenet of American procedure" in the context of a motion to compel

---

Honeywell's argument that we may look to the second amended complaint filed in the state court when analyzing the merits of the removal itself.

[7] We will discuss the merits of the defendants' federal officer removal argument pursuant to § 1442 in a later section.

23-13200                Opinion of the Court                11

arbitration, concluding that "the *Griggs* rule requires that a district court stay its proceedings while the interlocutory appeal on the question of arbitrability is ongoing." *Id*. at 740, 744. The question before us is whether the *Griggs* principle requires the automatic stay of all district court proceedings during appeals of remand orders in federal officer removal cases.

The defendants argue that *Coinbase*'s application of *Griggs* applies to appeals of remand orders under the federal officer removal statute, because appeals divest the district court of control over the aspects of the case involved in the appeal, and appeals regarding federal officer removal, as do appeals of arbitrability, involve the entire case. The City, on the other hand, contends that *Coinbase*'s reasoning was narrow and turned on the fact that discovery would not be available in arbitration, while in this context parties would engage in discovery in both federal and state court. We conclude that, under the *Griggs* principle as applied in *Coinbase*, the defendants' notice of appeal stayed the entirety of the district court's proceedings and divested the district court of jurisdiction to remand the case, rendering the subsequent state court proceedings without legal effect.

To begin, *Griggs* explained that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." 459 U.S. at 58. This principle grew from the general understanding that "a federal district court and a federal court of appeals should

not attempt to assert jurisdiction over a case simultaneously." *Id.* While neither the Supreme Court nor this Court have previously applied the *Griggs* principle to appeals of remand orders concerning federal officer removal, in *Coinbase* the Supreme Court applied *Griggs* to determine that a notice of appeal of arbitrability automatically stayed all district court proceedings. 599 U.S. at 741. The Court's reasoning in *Coinbase* demonstrates that *Griggs* calls for an automatic stay in this context as well.

At issue in *Coinbase* was the appeal of the district court's denial of a motion to compel arbitration. *Id.* Congress had provided, by statute, for immediate appeal of a district court's denial of such motions, but the statutory provision did not explicitly call for an automatic stay of district court proceedings upon appeal. *Id.* at 740. The Court determined, nonetheless, that the "*Griggs* principle resolve[d] th[e] case." *Id.* at 741. *Griggs* held that an appeal divested the district court of jurisdiction over "those aspects of the case involved in the appeal." 459 U.S. at 58. Because the appeal in *Coinbase* would decide "whether the case belongs in arbitration or instead in the district court," the Court found that "the entire case [wa]s essentially 'involved in the appeal.'" 599 U.S. at 741 (quoting *Griggs*, 459 U.S. at 58)). And Congress did not need to explicitly require a stay in the statutory text of the Federal Arbitration Act because, "absent contrary indications, the background *Griggs* principle already require[d] an automatic stay." *Id.* at 743–44. The Court observed that when Congress does not want the *Griggs* principle to apply, it "typically says so" expressly, pointing to a litany of "statutory 'non-stay' provisions" where

Congress had clearly chosen to "authorize an interlocutory appeal, but *not* to automatically stay district court proceedings pending that appeal." *Id.* at 744 (emphasis in original); *see id.* at 744 n.6 (collecting statutes with express "non-stay" provisions).

In support of its conclusion, the Court cited circuit decisions "in the analogous contexts of qualified immunity and double jeopardy" and of other interlocutory appeals that had similarly held that district court proceedings were automatically stayed for the pendency of the appeal. *Id.* at 742–43. The Court further pointed out that this "common practice reflects common sense": "continuation of proceedings in the district court largely defeats the point of the appeal" and functionally "nullified" Congress's choice to provide an interlocutory appeal of such orders. *Id.* (quotation omitted). Without a stay, the benefits of arbitration, such as avoiding extensive discovery, could be lost and parties could be forced to settle while awaiting the appellate court's decision. *Id.* at 743. Thus, the Court concluded that the district court "was required to stay its proceedings" once Coinbase appealed its order. *Id.* at 747.

The *Coinbase* Court's reasoning clearly supports requiring an automatic stay of all district court proceedings in this case. First, the Court presented the *Griggs* principle as a "rule" that required its conclusion that appeals of arbitrability decisions automatically stayed underlying proceedings—a rule that operated in the background of statutory grants of appellate review, unless Congress clearly indicated otherwise. *Id.* at 743–44. The provision

14                    Opinion of the Court                    23-13200

granting review in this case, § 1447(d), includes no express "non-stay" language, so *Coinbase* indicates that the background *Griggs* principle applies.

Second, just as an appeal of a motion to compel arbitration decides the forum in which proceedings will continue, the appeal of a remand order decides "whether the case belongs in [state court] or instead in the district court." *Id.* at 741. In both contexts, "the entire case is essentially 'involved in the appeal.'" *Id.* (quoting *Griggs*, 459 U.S. at 58).

And third, *Coinbase*'s concern about nullifying Congress's grant of appellate review also applies here: the City's own mootness arguments demonstrate the very real possibility of undermining appellate review in federal officer removal cases absent an automatic stay. Unless the district court or state court grants a discretionary stay pending appeal, it is likely that state court proceedings during the appeal would require the defendants to engage in litigation in state court—the very action the City contends moots this appeal—or that the plaintiff would amend its complaint—the grounds for the City's other mootness argument—in order to avoid a possible reversal on appeal. Recognizing an automatic stay in this context preserves Congress's choice to grant appellate review of decisions denying federal officer removal.

For these three reasons, it necessarily follows from *Coinbase* that the *Griggs* rule requires an automatic stay of all district court

23-13200                Opinion of the Court                15

proceedings pending appeal of a remand order in the context of federal officer removal.[8]

We are not alone in concluding that *Griggs* and *Coinbase* require an automatic stay in this context. The Fourth Circuit recently considered the same question in the context of federal officer removal and determined that "[u]nder a fair[] reading of *Coinbase*, the district court was automatically stayed from mailing the remand order." *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 268 (4th Cir. 2025). The court distilled from *Coinbase* three principles it believed resolved the question: First, when the question on appeal is "the whole ballgame" (such as whether the district court or the arbitrator should act as factfinder), the appeal divests the district court of "control over more or less the whole case," otherwise the appeal would be pointless. *Id.* at 269. Second, an automatic stay is, as its name implies, self-executing, so a district court must "immediately . . . halt all proceedings covered by the *Griggs* principle when a proper notice of appeal is docketed, whether or not the parties ask it to." *Id.* at 269–70. And third, "because *Griggs* identifies a background principle," Congress need not affirmatively include an automatic stay provision (although it can certainly create exceptions to the general principle); "the default rule is that an appeal automatically stays all aspects of the case involved in the appeal." *Id.* at 270. Based on these principles— applied in an analysis closely tracking our discussion above—the

---

[8] No party in this case requested a stay in federal court, but *Coinbase* is clear that the stay is "automatic." *See, e.g.*, 599 U.S. at 742.

16                    Opinion of the Court                    23-13200

Fourth Circuit concluded it was "clear that the *Griggs* principle applies just as forcefully here as it did in *Coinbase* itself." *Id.*[9]

---

[9] The Ninth Circuit, considering the same automatic stay question in the federal officer removal context, limited *Coinbase* to the arbitration context. *California v. Express Scripts, Inc.*, 139 F.4th 763, 768 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 1507 (2026) (mem.). The court pointed out that federal officer removal from state court presents "unique federalism issues" not present in the arbitration context and highlighted that "a stay is an 'intrusion into the ordinary processes of administration and judicial review.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). According to the Ninth Circuit, a stay in a case involving an improper removal might "infringe upon the rights of state courts" to hear "cases that should rightfully be heard in their fora, in violation of comity principles." *Id.* at 769. Thus, the Ninth Circuit determined that stays in this context should be discretionary rather than automatic. *Id.*

Federalism and comity with state courts are certainly important principles. *See, e.g.*, *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 907 (11th Cir. 2023). But the *Griggs* principle is a rule of federal appellate procedure that stays only federal district court proceedings. And, in any event, Congress struck a balance when it explicitly allowed defendants to appeal remand orders in the federal officer removal context—an exception from the non-appealability of most remand orders. *See* 28 U.S.C. § 1447(c), (d). It did so without including an express non-stay provision, as it has done elsewhere. *See Coinbase*, 599 U.S. at 744. So a free-floating federalism concern cannot overcome Congress's decision to provide a meaningful appeal of decisions denying federal officer removal.

The Ninth Circuit also asserted that the "unique features of arbitration" demonstrate why the *Coinbase* Court would conclude that an automatic stay was warranted in that context, and that the same concerns did not attach in the federal officer removal context. *California*, 139 F.4th at 770. But as we discussed above, *Coinbase* stated the *Griggs* rule as a clear background principle—regardless of the type of case—that "divests the district court of its control over those aspects of the case involved in the appeal." 599 U.S. at 740 (quotations omitted). And in appeals of both arbitrability decisions and federal

Relying, then, on the *Griggs* principle as explained in *Coinbase*, we hold that the appeal of a motion to remand under § 1447(d) triggers an automatic stay of all district court proceedings—including the remand order—pending resolution of the appeal. *See Coinbase*, 599 U.S. at 740. Thus, any subsequent state court proceedings are rendered void for our purposes. *See Maseda v. Honda Motor Co., Ltd.*, 861 F.2d 1248, 1254–55 (11th Cir. 1988) (noting that "after removal," "[a]ny subsequent proceedings in state court on the case are void *ab initio*"); *cf. Lee v. U.S. Bank Nat'l Ass'n*, 102 F.4th 1177, 1180 (11th Cir. 2024) (observing that, in the bankruptcy context, "actions taken in violation of the automatic stay are void and without effect," including foreclosure actions in state court (quotations omitted)).

It is irrelevant to our conclusion that, in this case, the district court had already mailed the remand order to the state court when the defendants filed their notice of appeal.[10] The *Griggs* principle

---

officer removal denials, the question on appeal is "whether the case should be litigated in the district court"; in both contexts, "the entire case is essentially involved in the appeal." *Id*. at 741 (quotations omitted). The Ninth Circuit also asserted that "[a]ll other circuits where this question has been raised, besides the Fourth Circuit, appear to have reached the same conclusion." *California*, 139 F.4th at 766 n.2. But it cites no published circuit decisions analyzing the *Coinbase* issue in this context and refusing to apply it.

For these reasons, we are unpersuaded by the Ninth Circuit's reasoning and conclude that *Coinbase* does indeed counsel application of the *Griggs* principle in the federal officer removal context.

[10] Section 1447(c), which applies to removals generally, requires the district court clerk to mail a "certified copy of the order of remand . . . to the clerk of

18                     Opinion of the Court                23-13200

operated to stay the remand order even though it had already been mailed. Congress explicitly provided that "an order remanding a case to the State court from which it was removed" pursuant to federal officer removal "shall be reviewable by appeal or otherwise."[11]   28 U.S.C. § 1447(d). The administrative task of mailing the remand order to the state court cannot operate to prevent the very opportunity for review Congress explicitly provided in federal officer removal cases. Such would be the case if the district court lost jurisdiction over a case to the state court as soon as it mailed a remand order whenever it did so before the defendants filed notices of appeal. Other circuits have agreed that the mailing of a reviewable remand order does not divest the

---

the State court," at which time the "State court may thereupon proceed with such case." 28 U.S.C. § 1447(c). While the district court docket does not indicate exactly when the remand order was mailed in this case, it does include the court's remand order, dated September 1, 2023, instructing the Clerk to "REMAND this case to the Superior Court of Glynn County, Georgia" and to "CLOSE this case." The docket further reflects that the Clerk entered judgment and closed the case that same day. The Superior Court docket shows that the district court's remand order was docketed on September 6, 2023. The defendants' timely notices of appeal followed on September 25 and 26, 2023.

[11] This "or otherwise" language has been interpreted to mean that the district court retains jurisdiction to "review . . . vacate or reinstate" reviewable remand orders. *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 371–72 (5th Cir. 2023) (quoting *In re Shell Oil Co.*, 631 F.2d 1156, 1158 (5th Cir. 1980)); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (holding that all decisions from the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit").

district court of jurisdiction.  *See Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 371–72 (5th Cir. 2023) (holding that a district court had jurisdiction to issue a discretionary stay of a reviewable remand order even after the order was mailed); *Shapiro v. Logistec USA, Inc.*, 412 F.3d 307, 312 (2d Cir. 2005) (holding that, unlike unreviewable remand orders, which divest the district court of jurisdiction when the order is mailed, "the mailing of [a reviewable] remand order to the state court does not strip the federal court of jurisdiction"); *Hudson United Bank v. LiTenda Mortg. Corp.*, 142 F.3d 151, 158 (3d Cir. 1998) (concluding that "the mailing of a remand order does not divest a district court of jurisdiction to entertain a motion for reconsideration" in cases involving reviewable remand orders).

Because the district court retains jurisdiction to reconsider or amend reviewable remand orders after such orders are mailed, the *Griggs* principle acted to stay the district court's reviewable remand order in this case when the defendants filed notices of appeal, even though the order had already been mailed.  And, again, because the remand order was stayed, the subsequent state court proceedings were "void *ab initio*" for our purposes.  *See Maseda*, 861 F.2d at 1254–55.  We therefore disregard both the City's amended complaints in state court and the defendants' litigation activity there.  For this reason, the City's argument that

20                    Opinion of the Court                    23-13200

its amended complaints in state court mooted this appeal fails, and we deny the City's motion to dismiss this appeal.[12]

Having concluded that we have jurisdiction, we now turn to the merits of this appeal.

---

[12] The City's motion to dismiss fails for another reason. The City argues that the defendants waived any right they had to proceed in federal court when they "s[ought] resolution on the merits in their favor" in state court after remand. Specifically, the City points to the defendants' respective answers to the complaint, motions to dismiss, and participation in a hearing on pending motions. The City argues that by seeking relief in state court, the defendants have consented to the state court's jurisdiction.

True, a defendant with valid grounds for removal can nonetheless waive the right to remove by "taking some substantial offensive or defensive action in the state court action indicating a willingness to litigate in that tribunal *before* filing a notice of removal with the federal court." *Yusefzadeh v. Nelson, Mullins, Riley & Scarborough, LLP*, 365 F.3d 1244, 1246 (11th Cir. 2004) (emphasis added) (quotations omitted). In this case, though, the City points only to actions the defendants took *after* the district court remanded the case to state court. As previously recounted, the state court initially stayed the proceedings pending this appeal after the district court remanded the case. The City, however, asked the court to withdraw the stay, which the court ultimately did. At that point, the defendants had no choice but to participate in the state court litigation proceedings. The City has not identified any case of this Court where such post-remand activities in state court waived defendants' otherwise-meritorious appeal of a remand order.

Thus, the defendants' litigation activity in state court post-remand, necessitated by the City's request to lift the stay pending appeal, does not waive their right to remove or to appeal the district court's remand order. *See R.R. Street & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 973 (9th Cir. 2011) (concluding parties did not waive their right to appeal a remand order when they "merely sought to preserve their claims in state court pending the outcome of th[e] appeal").

23-13200              Opinion of the Court              21

B.      *The defendants may remove this case pursuant to the federal officer removal statute*

The defendants argue that this action is removable pursuant to 28 U.S.C. § 1442(a)(1), which governs federal officer removal, because the defendants' remediation activities were performed under the authority of EPA, and the remediation is the subject of the City's claims. The City responds that federal officer removal is inappropriate because the defendants are merely regulated parties, not government employees or contractors serving as *de facto* federal agents. We conclude that the defendants are entitled to remove the action to federal court under § 1442(a)(1).

The federal officer removal statute allows for the removal from state court to federal court of any action against "any officer (*or any person acting under that officer*) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). The statute has been "liberally construed" in favor of a federal forum, *Watson v. Philip Morris Co.*, 551 U.S. 142, 147 (2007), and "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute," *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir. 1989) ("This statute is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties.").

Because the defendants are not themselves federal officers, they must satisfy a three-pronged test to show that removal is proper: they must (1) "show that [they are persons] within the meaning of the statute who acted under a federal officer," *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017); (2) show that the suit is "for or relating to any act under color of such office"—*i.e.*, establish that the actions taken under federal control are "closely connected" to the plaintiff's claims, *Plaquemines Parish*, 146 S. Ct. at 1057, 1060 (quotations omitted); and (3) "assert a colorable federal defense," *id.* at 1057–58 (quotations omitted). *See* 28 U.S.C. § 1442(a)(1).

The defendants, as the parties seeking removal, bear the burden of proof.[13] *See Georgia v. Meadows*, 88 F.4th 1331, 1348 (11th Cir. 2023). Importantly, at the removal stage of litigation, courts "credit the [defendant's] theory of the case for purposes of [all] elements of [the court's] jurisdictional inquiry," *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999), and we subject the defendant's allegations in support of removal to "the same liberal rules . . . that are applied to other matters of pleading," *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) (quotations omitted).

---

[13] Because the removing party bears the burden of proof, we may consider evidence attached to the removal petition along with post-petition evidence to establish facts relevant to jurisdiction that existed at the time of removal. *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 946, 949 (11th Cir. 2000). We therefore may rely on the documents the defendants attached to their notice of removal, which include the defendants' consent decree with EPA and other documents related to the defendants' relationship with EPA.

*See Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020) (noting that removal allegations need only be "facially plausible"); *Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) ("Not only must the words of § 1442 be construed broadly but a court also must credit [the] [d]efendants' theory of the case when evaluating the relationship between the defendants' actions and the federal officer." (quotations omitted)).

> 1. The defendants were persons "acting under" EPA when they undertook to remediate the pollution emanating from the Plant Site[14]

The defendants satisfy the first prong of the federal officer removal test because they acted under EPA when remediating the pollution on and around the Plant Site. The Supreme Court has explained that the relationship between the officer or agency and the private entity "acting under" the agency "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151 (quotations omitted). In addition, the "private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphasis in original). "In other words, the private person must help federal officers fulfill a basic governmental task that the government otherwise would have had to perform." *Caver*, 845 F.3d at 1143. At the same time, this help or assistance must involve more than

---

[14] The parties do not dispute that the defendants qualify as persons within the meaning of the statute. *See Caver*, 845 F.3d at 1142.

"simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original).

> A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Id.* at 153.

The City does not dispute that the defendants are subject to EPA's guidance and control of their remediation efforts. It argues, however, that the defendants are not assisting EPA with its own governmental task but simply complying with EPA regulation. We disagree.

Two cases illustrate the distinction between "acting under" and mere compliance. First, in *Watson* the Supreme Court determined that Philip Morris, a tobacco company, was not "acting under" the Federal Trade Commission ("FTC") when it advertised "light" cigarettes that indicated "lower tar and nicotine levels than those present in other cigarettes." *Id.* at 146. Philip Morris argued that it was "acting under" the FTC because the plaintiffs were essentially challenging the FTC-imposed method of testing cigarettes when the plaintiffs argued that Philip Morris's cigarettes were more potent than its advertising suggested. *Id.* The Court disagreed, concluding that Philip Morris was not "perform[ing] a job that," otherwise, "the Government itself would have had to

perform," *id.* at 154, nor did the FTC's regulation and supervision of Philip Morris's testing constitute "a delegation of authority," *id.* at 157. Instead, the "FTC/Philip Morris relationship" was a "usual regulator/regulated relationship," which did not "bring[] Philip Morris within the terms of the [federal officer removal] statute."[15] *Id.* at 157; *see also Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 159 (11th Cir. 2024) (concluding that an assisted living home complying with federal COVID-19 orders could not remove a case to federal court because, "aside from allegedly complying with 'orders' and 'instructions' from the Secretary and HHS, Defendants ha[d] failed to show that they helped or assisted a federal agency to perform its duties or tasks" (alterations adopted)).

Next, in *Caver* we came to the opposite conclusion and determined that a company "acted under" a federal agency when considering the relationship between a rural electric cooperative and the U.S. Department of Agriculture Rural Utilities Services ("RUS"). 845 F.3d at 1143–44. We first noted that RUS highly regulated the defendant, "demonstrat[ing] the close and extensive relationship between [the defendant] and RUS" and the "significant level of control" RUS exercised over the defendant. *Id.* at 1143. But, as *Watson* made clear, even significant regulation, standing

---

[15] The *Watson* Court offered other examples of "help[]" or "assist[ance]" that demonstrated compliance rather than "'acting under' a federal official who is giving an order or enforcing the law": "[t]axpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, [and] for that matter well-behaved federal prisoners." 551 U.S. at 152.

alone, would not be enough for removal to be proper. *Id.* at 1142. Our analysis therefore proceeded to determine that the relationship between the government and the defendant went beyond regulation: rural electric cooperatives functioned as "instrumentalities of the United States" that existed to carry out the government's objective of "bringing electricity to sparsely populated rural areas that would not otherwise receive electricity." *Id.* at 1143. Because the defendant "assist[ed] the RUS by performing a job that, in the absence of a contract with a private firm, the Government itself would have had to perform," we concluded that it was "acting under" RUS and thus met the first prong of the federal officer removal test. *Id.* at 1144 (alteration adopted) (quotations omitted).

*Watson* and *Caver* provide the framework for our decision in this case. Does EPA simply regulate the defendants, requiring them to comply with its directives, or are the defendants' remediation efforts assisting EPA by performing a task that EPA would otherwise have to perform? CERCLA's text and the consent decree answer this question: CERCLA makes EPA responsible for the remediation efforts on the Plant Site, a responsibility it can, and did, delegate to the defendants when it required them to undertake various remediation actions and entered a consent decree with the defendants calling for further remediation. *See Atl. Richfield*, 590 U.S. at 6.

Congress enacted CERCLA, 42 U.S.C. § 9601 *et seq.*, also known as the "Superfund statute," to address "the serious

environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). CERCLA provides "a comprehensive scheme for the cleanup of hazardous waste sites." *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1071 (11th Cir. 2002). CERCLA "directs EPA to compile and annually revise a prioritized list of contaminated sites for cleanup, commonly known as Superfund sites." *Atl. Richfield*, 590 U.S. at 6 (citing 42 U.S.C. § 9605). EPA, wielding authority delegated by the President, must either "clean those sites itself or compel responsible parties to perform the cleanup." *Id.* (citing 42 U.S.C. §§ 9604, 9606, 9615).

The statute and implementing regulations require EPA to develop a cleanup plan that includes "a remedial investigation and feasibility study to assess the contamination and evaluate cleanup options" (which EPA will perform or order a private party to conduct) and "extensive public consultation," including public notice and comment and "substantial and meaningful involvement by each State" in the choice of a cleanup plan. *Id.* at 7 (quotation omitted) (first citing 40 C.F.R. § 300.430 (2019); and then citing 42 U.S.C. §§ 9613(k), 9617, 9621(f)(1)). Once the feasibility study begins, "'no potentially responsible party may undertake any remedial action' at the site without EPA approval." *Id.* (quoting 42 U.S.C. § 9622(e)(6)).

Each of these steps has taken place in this case, and EPA has tasked the defendants with the responsibilities EPA would otherwise have had to accomplish itself. EPA ordered the

defendants to undertake a remedial investigation and feasibility study in 1995 and shortly thereafter placed the Plant Site on the CERCLA National Priorities List.  Rather than "clean th[e] site[] itself," EPA chose to compel the defendants "to perform the cleanup."  *See Atl. Richfield*, 590 U.S. at 6.  Thus, in the years following the investigation and study, EPA directed the defendants to undertake various remediation actions such as "remov[ing] one foot of soil from thirteen acres of the marsh and sediment in creeks in front of the old Honeywell trash dump."  Ultimately, in 2016, the defendants and EPA entered a consent decree binding the parties to EPA's chosen remediation plan (as outlined in EPA's final Record of Decision).  The consent decree affirmed that EPA had followed CERCLA's required steps (including public notice and opportunity for State involvement).

The consent decree demonstrates that EPA maintained considerable authority over the remediation activities.  It explained that EPA could designate a "Project Coordinator" along with "other representatives, which may include [EPA's] employees, contractors and/or consultants, to oversee the Work," oversight that "include[d] the authority to halt the Work and/or to conduct or direct" emergency response actions when "necessary."  EPA could also require the defendants to "conduct community involvement activities under EPA's oversight" including "designation of a Community Involvement Coordinator and implementation of a technical assistance plan."  The consent decree also outlined that EPA could take over performance of the

remediation work if it determined that the defendants were not adequately implementing the remediation plan.

The details of CERCLA's statutory scheme and the history of EPA's involvement here show that the defendants are acting under EPA in carrying out remediation efforts at the Plant Site: EPA exercised a "significant level of control" over the defendants, and the defendants were carrying out CERCLA and EPA's objectives when they engaged in remediation efforts. *See Caver*, 845 F.3d at 1143. More importantly, because CERCLA tasks EPA with cleaning up hazardous waste, directing it either to remediate such pollution itself or to "compel responsible parties to perform the cleanup," *Atl. Richfield*, 590 U.S. at 6, the defendants assisted EPA by "perform[ing] a job that . . . the Government itself [otherwise] would have had to perform." *Watson*, 551 U.S. at 154; *see Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding this prong is met when "the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete"). Just as in *Caver*, the defendants operate—in a limited manner—as "instrumentalities of the United States" for the purpose of cleaning the Plant Site on behalf of EPA.[16] *Id.* at 1143.

---

[16] Although the City's allegations relate to pollution that has traveled to its own property, as well as pollution at the Superfund site, the defendants argue that CERCLA and the consent decree govern *all* their remedial actions related to pollution from the Superfund site, not just remediation on the site itself. *See* 42 U.S.C. § 9622(e)(6) (noting that, after a consent decree has been entered, "no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President"

The City argues that we should be persuaded by a Fourth Circuit case holding that defendants seeking § 1442 removal were not "acting under" EPA when EPA required them "to perform certain remedial measures to obtain an operating permit." *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 301 (4th Cir. 2022) ("*WVSU*"). It is true that the Fourth Circuit case shares some surface similarities with this one: both involve environmental pollution emanating from a property owned by the defendants, and in both cases the defendants worked with EPA to identify and implement necessary corrective actions. *See id.* at 292–94. But the defendants' relationship with EPA in *WVSU* was governed, not by CERCLA, but by the Resource Conservation and Recovery Act ("RCRA")—a critical distinction. Under RCRA, the defendants applied for a permit to operate hazardous waste management units, and EPA granted the permit with a general condition that the defendants had an ongoing obligation to comply with any corrective measures EPA imposed. *Id.* at 292–94. The *WVSU* defendants attempted to argue that they were "acting under EPA authority" because their "corrective actions were taken only at the direction and oversight of EPA, which . . . EPA itself would

through EPA); *id.* § 9601(9) (defining "facility" as "any site or area where a hazardous substance has been deposited . . . or otherwise come to be located"). *See Atl. Richfield*, 590 U.S. at 17–23 (explaining these provisions). At this time, we need not decide whether the defendants' argument about the scope of CERCLA and the consent decree under these provisions is correct on this point, since we "credit the [defendant's] theory of the case for purposes of [all] elements of [the court's] jurisdictional inquiry." *Jefferson County*, 527 U.S. at 432.

have performed under CERCLA if Defendants had not." *Id.* at 303 (alteration adopted) (quotations omitted).  But the Fourth Circuit found that the defendants were simply regulated by EPA pursuant to RCRA, as Philip Morris was regulated by the FTC in *Watson*, and thus removal was improper. *Id.* at 302–06.  Crucially, the *WVSU* court explicitly distinguished its facts from a hypothetical case where "the federal government [had] ordered a 'cleanup' under CERCLA and [had] taken over remediation responsibilities" on the property, concluding that the defendants' argument invoking CERCLA was speculative and irrelevant, given the "detailed and lengthy procedure" needed to designate the property a Superfund site and develop a remedial action plan in the first place. *Id.* at 306; *cf. Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017) (concluding that a state environmental agency was not entitled to removal simply because EPA could "intervene if a state fails to properly exercise its primary enforcement authority").

No such speculation is needed here.  EPA has already executed CERCLA's lengthy procedure and adopted a remedial plan under which EPA has chosen to have the defendants carry out the necessary remediation efforts as required by the consent decree.  Thus, the defendants do more than "simply comply[]" with "federal laws, rules, and regulations," *Watson*, 551 U.S. at 152–53; rather, they are "help[ing] federal officers fulfill a basic governmental task that the government otherwise would have had to perform," *Caver*, 845 F.3d at 1143.

32                      Opinion of the Court                      23-13200

Accordingly, we conclude that the defendants were "acting under" EPA in the context of their remediation efforts on the Superfund site, satisfying the first prong of the federal officer removal test.

> 2.    The City's allegations and state tort claims are "for or relating to" the defendants' remediation activities as directed by EPA

Under the second prong of the federal officer removal test, we consider whether the actions forming the basis of the City's claims are "closely connected" to the defendants' actions taken under color of law. *Plaquemines Parish*, 146 S. Ct. at 1060. The defendants argue that they satisfy this prong of the test because the defendants' remediation efforts, governed by CERCLA and the consent decree, are "critical to the City's theory of liability for continuing nuisance and continuing trespass."[17]

The federal officer removal statute allows for removal of cases "for or relating to any act under color of such office," 28 U.S.C. § 1442(a)(1), language we have interpreted to call for only "a connection or association between the act in question and the federal office" rather than a strict causal relationship, *Caver*, 845 F.3d at 1144 (quotations omitted); *see also Plaquemines Parish*, 146 S. Ct. at 1060 ("[A] removing defendant need not show that his federal

---

[17] The City does not argue, on appeal, why the defendants fail to meet the second prong of the federal officer removal test, asserting only that the defendants are not "*de facto* federal agent[s]."

duties specifically required or strictly caused the challenged conduct."). While "a tenuous, remote, or peripheral" relationship between the "challenged conduct and the performance of [the defendants'] federal duties" is not sufficient, "[o]ne thing can relate to another even if the connection is indirect" and "even if it was not specifically designed to affect it." *Plaquemines Parish*, 146 S. Ct. at 1061, 1060 (quotations omitted); *see also id.* at 1062 ("[T]he ordinary meaning of 'relating to' does not require the defendant to show that his federal duties specifically invited his challenged conduct.").

*Caver* demonstrates the type of "connection or association" that satisfies this prong of the test. In *Caver*, the defendant argued that it could not make the cash distributions for which the plaintiffs were suing because doing so would cause it to breach its agreement with RUS, the federal agency. 845 F.3d at 1145. We determined the defendant had met the connection prong because it alleged that "the acts for which [it was] being sued . . . occurred because of [its] performance of its duties" under its agreement with RUS. *Id.*; *see Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (*en banc*) (concluding a defendant satisfied this prong when the defendant performed the activities forming the basis of the lawsuit "pursuant to directions of the U.S. Navy"). On the other hand, we have rejected a federal officer's attempt to remove when his official duties did not overlap with the activities for which he was being prosecuted. *See Meadows*, 88 F.4th at 1349; *see also Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 730 (9th Cir. 2015) (affirming remand when a defendant "failed to provide any

evidence of federal control or supervision over" the actions plaintiffs challenged, as relevant to the court's discussion of the "for or relating to" prong).

As in *Caver*, the allegations in the City's complaint and the defendants' notice of removal demonstrate that the City's claims against the defendants are closely connected to the defendants' remediation efforts as directed by EPA. The City alleges that "Honeywell's activities at the Plant Site caused and continue to cause toxic mercury and PCBs to be spilled, discharged and deposited into the Turtle River . . . and onto property of the City of Brunswick." It has brought claims for "continuing trespass" and "continuing nuisance," alleging that the "[d]efendants' continuing failure and refusal to permanently remove their pollution from property of the City of Brunswick[] unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property" and with "the City's use and enjoyment of its property."[18] But the defendants' notice of removal alleges that their remedial actions are governed by their consent decree with EPA, which, along with CERCLA's text, prevents them from undertaking any remedial actions without EPA's authorization. Thus, according to the defendants' allegations, "the acts for which [they are] being sued"—failure to adequately remediate pollution on the City's property—"occurred because of

---

[18] The City does not allege that either defendant is continuing to dump new pollutants on its property, just that the defendants are not adequately dealing with the pollution already present.

[their] performance of [their] duties" and their consent decree with EPA. *Caver*, 845 F.3d at 1145. The defendants have "plausibly alleged a close relationship between [their] challenged conduct and the performance of [their] federal duties."[19] *Plaquemines Parish*, 146 S. Ct. at 1061.

We therefore conclude that the City's continuing trespass and nuisance claims for the defendants' continued failure to remediate the pollution on the City's property are related to the defendants' CERCLA-governed remediation plan, meeting the second prong of the federal officer removal test.[20]

---

[19] In its briefing below, the City argued that the defendants failed the "causal connection" prong because it was "not suing Defendants for the way they have conformed or failed to conform to the Consent Decree" but rather "for the pollution that migrated into the Marshes of Glynn long before EPA became involved." But the language of the complaint alleges "continuing trespass" and "continuing nuisance," language which, on its face, challenges the sufficiency of the defendants' current remediation efforts by asserting that pollution continues to emanate from the Plant Site onto the City's property. And even if the claims in the complaint also encompass the defendants' actions before EPA's involvement, removal would still be proper. *See Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992) (quoting another case for the proposition that "if one claim cognizable under Section 1442 is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims").

[20] Our holding today serves to clarify this Court's interpretation of the "for or relating to" prong of the federal officer removal test. A previous version of the relevant provision allowed for removal of only those actions "for any act under color of such office." *See* 28 U.S.C. § 1442(a)(1) (2010). But in 2011 Congress amended the provision, adding the words "or relating to." *Caver*, 845 F.3d at 1144 n.8. Even after this amendment, we continued to require a

3.    The defendants have raised a colorable federal defense

Finally, for the third prong of the federal officer removal test, we ask whether the defendants have raised a colorable federal defense. *Caver*, 845 F.3d at 1145. The defendants argue that the City's claims are preempted by federal law because the City seeks to hold the defendants liable for failing to remove pollution from the Plant Site and surrounding areas, which conflicts with the

---

"causal connection" or a "causal nexus" between a plaintiff's claims and a defendant's conduct, although we recognized that the provision's amendment "broaden[ed] the scope of acts that allow a federal officer to remove a case to federal court." *Id.* at 1144–45 & 1144 n.8; *see Meadows*, 88 F.4th at 1348 (requiring the defendant to "establish some causal connection or association between [the alleged criminal actions] and his federal office" but noting that "the bar for proof is quite low" (quotations omitted)). The Supreme Court has since affirmed that "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines Parish*, 146 S. Ct. at 1060; *see Town of Pine Hill v. 3M Co.*, --- F.4th ----, 2026 WL 2178967, at *3 (11th Cir. July 29, 2026) (observing that "the hurdle erected by this requirement is quite low" (quotations omitted)). Instead, the "for or relating to" language requires only that the acts challenged by the removed lawsuit are "closely connected to the performance of [the defendants'] federal duties." *Plaquemines Parish*, 146 S. Ct. at 1062. Thus, while *Plaquemines Parish* does not change the test we have applied to the second prong pursuant to the broadened statutory language, it does suggest that we retire the "causal connection" and "causal nexus" language we have previously used.

23-13200                Opinion of the Court                37

defendants' remedial obligations under EPA's CERCLA-based directives.[21]

To satisfy this prong of the federal officer removal test, a "colorable federal defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Id.* (quotation omitted); *see Mesa v. California*, 489 U.S. 121, 129 (1989) ("[T]he validity of the defence authorized to be made is a distinct subject" and "has no connection whatever with the question of jurisdiction." (quotation omitted)). Because one key purpose of federal officer removal is to allow federal defenses to be tried in federal court, the "law does not require that the removing defendant virtually win his case before it can be removed." *Caver*, 845 F.3d at 1145; *see Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (stating that a defendant need only "raise a claim that is defensive and based in federal law" and "aris[es] out of [the party's] official duties" (quotations omitted)).[22] Thus, in *Caver*, we accepted

---

[21] As with the second prong, the City offers no argument on appeal why the defendants fail the third prong of the federal officer removal test.

[22] A recent Fifth Circuit decision demonstrates the low bar for a colorable federal defense. *See Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 346–47 (5th Cir. 2024). The defendant offered two federal defenses: failure to exhaust and preemption. The Fifth Circuit concluded that the failure to exhaust defense was colorable when asserted, allowing for removal, even though the court proceeded to reject that argument on its merits later in the same opinion. *Id.* at 346, 349. The court also credited the defendant's preemption defense as a plausible, colorable defense, highlighting that, while the Fifth Circuit had not yet decided that particular preemption question, the plaintiff had "cite[d] no contrary caselaw." *Id.* at 347.

as plausible the defendant's federal preemption defense when the Supreme Court had "expressly left open the possibility" that preemption could attach in a case like the defendant's. 845 F.3d at 1146.

The defendants in this case have offered a colorable federal defense: they plausibly contend that federal directives pursuant to CERCLA preempt state tort actions. "Conflict preemption can occur when (1) it is impossible for a party to comply with both state and federal law, or (2) the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 920 (11th Cir. 2020) (quotations omitted). A conflict preemption analysis asks whether the state law or legal action "stands as an obstacle to the carefully calibrated federal regime." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013). Thus "a conflict between federal and state law is imminent when two separate remedies are brought to bear on the same activity." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012) (quotations omitted).

As discussed above, CERCLA requires that once a party's obligations have been defined "pursuant to an administrative order or consent decree [after] a remedial investigation and feasibility study for a particular facility," "no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President." 42 U.S.C. § 9622(e)(6). And the statute's definition of "facility" plausibly

includes the City's property, an "area where a hazardous substance has . . . come to be located." *Id.* § 9601(9). The defendants have thus plausibly asserted that it would be impossible for them to comply both with their obligations under CERCLA and the consent decree and with potential remedies under state tort law; such remedies might counteract EPA's "carefully crafted federal regime" of remediation. *See Odebrecht Constr.*, 715 F.3d at 1274. The Supreme Court has reserved the question of whether an EPA-approved restoration plan could preempt state law, *see Atl. Richfield*, 590 U.S. at 25–26, and the City has cited no authority foreclosing this preemption defense. We thus conclude that the defendants have raised a colorable federal defense that CERCLA preempts the City's state tort claims.

⋆　⋆　⋆

In sum, then, we hold that the defendants have satisfied the three-prong test for federal officer removal and were entitled to remove this action pursuant to § 1442(a)(1) because they were acting under EPA when they engaged in remediation efforts controlled by CERCLA and the consent decree; the City's state tort claims are related to those remediation efforts; and the defendants have raised a colorable federal preemption defense.

## IV.    Conclusion

For the foregoing reasons, we deny the City's motion to dismiss the appeal and reverse the district court's remand to Glynn County Superior Court.

**REVERSED.**